**FILED**
CLERK, U.S. DISTRICT COURT
3/10/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2026 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>CLAYTON DEAN SAMPSON, and<br>ELISHA SAMPSON,<br><br>　　　　　Defendants. | CR 2:26-cr-00134-AH<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy to Operate an Illicit Digital Transmission Service; 18 U.S.C. § 2319C: Operation of an Illicit Digital Transmission Service; 18 U.S.C. § 1956(h): Money Laundering Conspiracy; 18 U.S.C. § 982: Criminal Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

A.　Defendants and Relevant Company

　　1.　Defendant CLAYTON DEAN SAMPSON ("CLAYTON SAMPSON") resided in San Bernardino County, California.

　　2.　Defendant ELISHA SAMPSON ("ELISHA SAMPSON") resided in San Bernardino County, California.

　　3.　Defendants CLAYTON SAMPSON and ELISHA SAMPSON owned, managed, and operated a company called EnvyTV LLC ("EnvyTV"), which

1  defendant CLAYTON SAMPSON later rebranded as The Clay Code Media
2  Player ("TCCMP" and collectively with EnvyTV, the "Illicit Company").
3  The Illicit Company provided online video and sports streaming
4  services, including live sporting events, television shows, and
5  movies.  For a subscription fee of approximately $69, the Illicit
6  Company allowed its subscribers to view copyrighted content owned by
7  various individuals and/or media companies.  The Illicit Company did
8  not hold any licenses for the copyrighted content it distributed to
9  its subscribers.  Beginning in or around 2024, the Illicit Company
10 also began selling a physical device called the MyStick that was
11 preloaded with more than 4,000 live channels, 13,000 movies, and
12 3,000 television shows.
13 B.   Victims
14      4.   Victim #1, an entity the identity of which is known to the
15 Grand Jury, was a content provider headquartered in Culver City,
16 California.
17      5.   Victim #2, an entity the identity of which is known to the
18 Grand Jury, was a content provider headquartered in Burbank,
19 California.
20      6.   Victim #3, an entity the identity of which is known to the
21 Grand Jury, was a content provider headquartered in Universal City,
22 California.
23      7.   Victim #4, an entity the identity of which is known to the
24 Grand Jury, was a content provider headquartered in Los Gatos,
25 California.
26      8.   Victim #5, an entity the identity of which is known to the
27 Grand Jury, was a content provider headquartered in Englewood,
28

Colorado.  Victims #1 through #5 are collectively referred to as the Video Content Providers.

///
///
///

                        COUNT ONE

                      [18 U.S.C. § 371]

                      [ALL DEFENDANTS]

The Grand Jury re-alleges and incorporates paragraphs 1 through 8 of the Introductory Allegations of this Indictment.

A.    OBJECT OF THE CONSPIRACY

Beginning on an unknown date, but no later than in or around December 2018, and continuing until at least in or around December 2024, defendants CLAYTON SAMPSON and ELISHA SAMPSON, and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to operate an illicit digital transmission service, in violation of Title 18, United States Code, Section 2319C.

B.    MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished in substance as follows:

   1.    Defendants CLAYTON SAMPSON and ELISHA SAMPSON would establish EnvyTV as a limited liability company in Nevada in or around 2018.

   2.    Defendants CLAYTON SAMPSON and ELISHA SAMPSON would use EnvyTV to illegally stream copyrighted content in exchange for payment, including content controlled by the Video Content Providers.

   3.    Following the receipt of a cease-and-desist letter in or around June 2020, defendants CLAYTON SAMPSON and ELISHA SAMPSON rebranded EnvyTV as TCCMP to conceal the Illicit Company's continued operation.

   4.    Co-Conspirators, including defendants CLAYTON SAMPSON and ELISHA SAMPSON, would pay for virtual servers to host the Illicit

Company's websites and digital transmission services, including a virtual server in Nepal.

5. Defendants CLAYTON SAMPSON and ELISHA SAMPSON would open bank accounts with U.S. financial institutions to operate the Illicit Company and would receive more than $4,000,000 in payments from subscribers of the illicit digital transmission service.

6. An unindicted co-conspirator would help develop a physical device called the MyStick that was preloaded with content copyrighted and owned by the Video Content Providers.

7. Defendants CLAYTON SAMPSON and ELISHA SAMPSON would sell the MyStick device to the Illicit Company's customers.

8. Defendants CLAYTON SAMPSON and ELISHA SAMPSON would publicly promote the Illicit Company's digital transmission service via various social media platforms.

9. The overall scheme to operate the Illicit Company involved the distribution of more than 4,000 live channels, 13,000 movies, and 3,000 television shows copyrighted and owned by the Video Content Providers.

C. OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, defendants CLAYTON SAMPSON and ELISHA SAMPSON, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, including, but not limited to, the following:

Overt Act No. 1:   On December 18, 2018, defendants CLAYTON SAMPSON and ELISHA SAMPSON registered EnvyTV with the Nevada Secretary of State.

1       Overt Act No. 2:   On an unknown date but no later than
2  December 31, 2018, defendant CLAYTON SAMPSON created a group on a
3  social media site titled "EnvySocial" (the "Envy Social Media
4  Group").
5       Overt Act No. 3:   On February 5, 2019, defendant ELISHA
6  SAMPSON submitted an application to a payment processor to process
7  payments for EnvyTV for the sale of content copyrighted and owned by
8  the Video Content Providers.
9       Overt Act No. 4:   On October 4, 2021, defendant CLAYTON
10 SAMPSON posted on the Envy Social Media Group: "Please support our
11 streaming of 818 channels including ALL sports and PPV (pay per view)
12 . . . you will find chat support at www[.]tccmp[.]com."
13      Overt Act No. 5:   On February 8, 2024, a co-conspirator based
14 in Nepal became an administrator of the Envy Social Media Group.
15      Overt Act No. 6:   On July 16, 2024, defendants CLAYTON SAMPSON
16 and ELISHA SAMPSON approved a subscription to TCCMP for $89.97 per
17 month for someone the co-conspirators believed was a customer, but
18 who was in fact an undercover law enforcement agent located in the
19 Central District of California (the "UC").
20      Overt Act No. 7:   On July 29, 2024, a co-conspirator caused
21 the shipment of a MyStick loaded with content copyrighted and owned
22 by the Video Content Providers to the UC at an address located within
23 the Central District of California.
24      Overt Act No. 8:   On August 12, 2024, co-conspirators,
25 including defendants CLAYTON SAMPSON and ELISHA SAMPSON, caused a
26 program to be digitally transmitted in the Central District of
27 California without the authority of the copyright owner, namely,
28 Victim #2.

<u>Overt Act No. 9</u>: On August 13, 2024, co-conspirators, including defendants CLAYTON SAMPSON and ELISHA SAMPSON, caused a program to be digitally transmitted in the Central District of California without the authority of the copyright owner, namely, Victim #4.

//
//
//

COUNT TWO

[ALL DEFENDANTS]

[18 U.S.C. §§ 2319C(b)(1), 2139C(c)(1), 2(a)]

1.  The Grand Jury re-alleges and incorporates paragraphs 1 through 8 of the Introductory Allegations of this Indictment.

2.  Beginning in or around December 2018 and continuing until in or around December 2024, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendants CLAYTON SAMPSON and ELISHA SAMPSON, each aiding and abetting the other, did willfully, and for purposes of commercial advantage and private financial gain, offer and provide to the public a digital transmission service that was primarily designed and provided for the purpose of publicly performing works protected under Title 17 of the United States Code by means of digital transmission without the authority of the copyright owners, including, but not limited to, the Video Content Providers, or the law.

COUNT THREE

[18 U.S.C. § 1956(h)]

[DEFENDANT CLAYTON SAMPSON]

The Grand Jury re-alleges and incorporates paragraphs 1 through 8 of the Introductory Allegations of this Indictment.

A.  OBJECT OF THE CONSPIRACY

Beginning on an unknown date, but no later than April 2, 2021, and continuing through at least in or around December 2024, in San Bernardino County, within the Central District of California, and elsewhere, defendant CLAYTON SAMPSON and others known and unknown to the Grand Jury, did knowingly conspire and agree to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of unlawful activity, which, in fact, involved the proceeds of a specified unlawful activity, that is, copyright infringement, committed in violation of Title 17, United States Code, Section 506(a) and Title 18, United States Code, Section 2319, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

B.  THE MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, in substance, as follows:

a.  Defendant CLAYTON SAMPSON would open a bank account ending in 1092 with JPMorgan Chase Bank (the "1092 Account") in San Bernadino, California, to operate the Illicit Company's digital transmission services.

      b.   Defendant CLAYTON SAMPSON would receive payments from subscribers of the Illicit Company in the 1092 Account.

      c.   Defendant CLAYTON SAMPSON would use the funds received from the subscribers of the Illicit Company for business and personal expenses, and to further promote the defendant's copyright infringement scheme.

      d.   Defendant CLAYTON SAMPSON would engage in international financial transactions to further the Illicit Company's business operations, including causing payments from the 1092 Account to one or more co-conspirators located in Nepal.

C. <u>OVERT ACTS</u>

In furtherance of the conspiracy, and to accomplish its object, defendant CLAYTON SAMPSON, together with others known and unknown to the Grand Jury, on or about the dates set forth below, committed the following overt acts, among others, in the Central District of California and elsewhere:

<u>Overt Act No. 1</u>:  On April 2, 2021, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

<u>Overt Act No. 2</u>:  On August 27, 2021, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

<u>Overt Act No. 3</u>:  On September 3, 2021, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

  <u>Overt Act No. 4</u>:  On March 4, 2022, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

  <u>Overt Act No. 5</u>:  On April 8, 2022, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

  <u>Overt Act No. 6</u>:  On April 19, 2022, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

  <u>Overt Act No. 7</u>:  On July 15, 2022, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

  <u>Overt Act No. 8</u>:  On July 15, 2022, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

  <u>Overt Act No. 9</u>:  On June 29, 2023, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

  <u>Overt Act No. 10</u>:  On October 13, 2023, defendant CLAYTON SAMPSON sent an international wire transfer of $500 from the 1092 Account to a bank account a co-conspirator controlled as payment for the co-conspirator's services related to the Illicit Company.

FORFEITURE ALLEGATION
[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction of the offenses set forth in Count Three of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

   (a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

   (b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or

//
//
//

(e) has been commingled with other property that cannot be divided without difficulty. Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

A TRUE BILL

/S/
Foreperson

TODD BLANCHE
Deputy Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

ANGELA MAKABALI
Assistant United States Attorney
National Security Division

COLIN S. SCOTT
Assistant United States Attorney
National Security Division